# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 17-cr-10376-FDS |
| | ) | |
| YANNICK MINANG | ) | |
| | ) | |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO SUPPRESS EVIDENCE

Defendant Yannick Minang ("Minang"), by and through undersigned counsel, hereby submits this Memorandum of Law in support of his Motion requesting that this Honorable Court enter an order suppressing all physical evidence and statements derived from the search of his apartment at 800 West St., Unit 1417 in Braintree Massachusetts on September 29, 2017.

The warrant authorizing the search lacked probable cause because it failed to establish a nexus between his residence and the crime(s) for which probable cause was established. In the alternative, the warrant was overbroad, because it lacked probable cause to believe evidence of money-laundering would be found on Minang's computers and electronic devices. Thus, the officers violated Minang's rights under the Fourth Amendment to the United States Constitution in obtaining and executing the search warrant. *See United States v. Rivera*, 825 F.3d 59, 63 (1st Cir. 2016). All evidentiary fruits of the search, including physical evidence and statements, should

be suppressed as fruit of the poisonous tree.  *See Wong Sun v. United States*, 371 U.S. 471, 487-488 (1963).  Minang requests a hearing on this motion.[1]

## BACKGROUND

The following is a summary of the materials Special Agent Kevin M. McCusker ("the affiant") submitted in support of the search warrant at issue here.  Specifically, on September 29, 2017, the affiant submitted to the Magistrate Judge a nine (9) page affidavit which incorporated by reference an affidavit he submitted the day before in support of a criminal complaint charging Minang with one (1) count of money laundering, in violation of 18 USC § 1956(a)(1)(B)(i)-(ii). The affidavit in support of the criminal complaint, which sets forth the bulk of the factual allegations, has been attached hereto as Exhibit A and the affidavit in support of the search warrant ("the warrant") has been attached hereto as Exhibit B.

The FBI began investigating Yannick Minang for money laundering on September 19, 2017, after Bank of America alerted them to a customer who claimed to have been defrauded by means of an email purporting to have come from his or her real estate broker.[2]  Ex. A at ¶6.  The customer told Bank of America he or she was intending to use the proceeds of a real estate transaction to purchase two properties in Nevada, and sent two wire transfers of $86,000 apiece to an account titled "Offre Trading" on August 24, 2017.  *Id.* at ¶7.  The Offre Trading account had been opened earlier that month by Eunice Offre, Minang's intermittent girlfriend.  *Id.* at ¶7-8.

---

[1] As set forth in Argument Section I/a, Minang also requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

[2] The customer is not identified in the affidavit, even by pronoun, but is referred to both as being from Massachusetts and as Canadian.  *Id.* at ¶7.

In California, a second unidentified person had reported losing $275,250 in closing funds in July to a similar email scheme that directed the payment to a Bank of America account, titled "Minang Trades," and opened by Minang several weeks before the transfer. *Id.* at ¶¶9-10. Funds from both the Offre Trading and Minang Trades accounts were wired to accounts in South Africa; funds were also withdrawn via cashier's checks made payable to "Minang Investments." *Id.* at ¶7-11. On September 22, agents interviewed Minang, warning him that the proceeds contained in the Offre Trading and Minang Trade accounts were obtained by fraud. *Id.* at ¶14.

Two days later a third person, also left unidentified in the affidavit, reported to the FBI that he or she had been similarly misdirected into wiring $150,000 into three accounts, one of which was with Citizens Bank, titled "Minang Escrows,"[3] with an associated address of 800 West Street, Braintree, Massachusetts.[4] Ex. A at ¶15. The day after speaking with the FBI agents,[5] Minang made two withdrawals of $9000 and $9500 from the "Minang Escrows" account at two different Citizens Bank branches. Ex. A at ¶¶17, 18. On September 27, the agents spoke with Minang's roommate Carlson Cho, who told them he had cashed a $35,000 check for Minang.[6] Ex. B at ¶8.

On the morning of September 29, FBI agents arrested Minang at the front door of the apartment he shared with Cho at 800 West Street, Unit 1417 in Braintree, Massachusetts. They

---

[3] The other two (2) accounts were not are not referenced in the affidavit.

[4] As set forth in Argument Section I/a, this proved to be false. The address associated with this account at the time the warrant was drafted was 40 Queens Way, Apt. 9, Framingham, MA. *See* Citizens Bank Records, attached hereto as Exhibit C. In compliance with Fed. R. Crim. P. 49.1, these materials have been redacted.

[5] As set forth in Argument Section I/a, this also proved to be false. The funds were withdrawn three (3) days after this interview. Ex. C.

[6] One of the withdrawals from the "Minang Trades" account was a cashier's check made payable to "C Tah Cho." *Id.* at ¶11.

saw a laptop and two smartphones in his bedroom while he dressed to accompany them.  Ex. B at ¶11.  The warrant, applied for and granted within hours, sought to search and seize "[a]ll records, in whatever form, between the period of June 2017 to the present, including but not limited to electronic data, e-mails, letters, hardcopy documents, and tangible objects, that constitute evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 1956(a)(1)(B)," as well as "[a]ny laptop computer, smartphone, or media storage device to include thumbdrives located in MINANG's bedroom at the Target Location as well as any record of passwords and login/user names."  *See* Attachment B to the Search and Seizure Warrant, attached hereto as Exhibit D.

## ARGUMENT

A "warrant application must demonstrate probable cause to believe that a particular person has committed a crime—"the commission element"—and that enumerated evidence relevant to the probable criminality likely is located at the place to be searched—"the 'nexus' element." *United States v. Zayas-Diaz*, 95 F.3d 105, 110-11 (1st Cir. 1996).  Further, to prevent "exploratory rummaging in a person's belongings" the warrant must also be "confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause." *United States v. Burdulis*, 753 F.3d 255, 260 (1st Cir. 2014).  The defendant's arguments, premised on these axiomatic Fourth Amendment principles, are summarized as follows: (1) the affidavit failed to sufficiently establish the requisite nexus between the defendant's residence and the criminal activity under investigation; and (2) the warrant's authorization to seize all electronic storage devices was unsupported by probable cause.

**I. The Affidavit in Support of the Warrant Failed to Establish an Adequate Nexus Between the Defendant's Residence and the Crime(s) Under Investigation.**

    a. Because the affidavit failed to establish probable cause to believe Minang committed a crime, it failed to establish a fair probability evidence of the crime would be found at his residence.

"[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules," *Illinois v. Gates*, 462 U.S. 213, 232 (1983).  "Probable cause exists when the affidavit upon which a warrant is founded demonstrates in some trustworthy fashion the likelihood that an offense has been committed." *United States v. Schaefer*, 87 F.3d 562, 565 (1st Cir.1996) (internal quotation marks omitted).  "'[M]ere suspicion, rumor, or strong reason to suspect [wrongdoing]' are not sufficient, *United States v. Vigeant*, 176 F.3d 565, 569 (1st Cir. 1999) (*quoting United States v. Han*, 74 F.3d 537, 541 (4th Cir.1996)) (brackets in original), and an "actual showing" of "criminal activity" is not required. *Gates*, 462 U.S. at 244 n. 13. Rather, "[p]robability is the touchstone." *United States v. Khounsavanh*, 113 F.3d 279, 283 (1st Cir. 1997).

Here, the affidavit describes a fraudulent scheme whereby three (3) real-estate broker's email addresses were compromised and subsequently used to deceive their customers into making wire transfers of funds the customers believed were being made to secure their respective real-estate transactions.[7]  The affiant (who did not describe in even vague terms how any of the real-estate brokers' email accounts had been compromised, whether the sender of the fraudulent emails

---

[7] Minang does not argue the warrant failed to establish probable cause to believe a crime committed altogether.  Although Minang argues the affidavit fails to establish *he* committed a crime, the warrant does appear to establish probable cause to believe someone, somewhere, committed wire fraud. For this reason, it appears the argument must be framed in terms of nexus rather than commission. *Compaire Vigeant*, 176 F.3d at 570-73 (invalidating warrant based on the commission element where the affidavit failed to establish probable cause to believe the defendant committed the sole crime under investigation), *with U.S. v. Cordero-Rosario*, 786 F.3d 64, 69 (2015) (invalidating warrant based on the nexus element where the affidavit established he committed lewd acts against a minor, but failed to establish how evidence of child pornography would be found on electronic devices in his residence).

did so with a "spoofed" email account or with the broker's own email account,[8] or even what was actually stated to the victims in the email correspondence) did not seek permission for, and the warrant did not authorize, the search of Minang's residence for evidence of this scheme. Instead, the warrant only authorized a search for evidence related to what the affidavit alleges is the laundering of the proceeds of that scheme.  It appears the reason for this is because probable cause to believe Minang committed or abetted the scheme had not yet been developed.[9]

That the affidavit avers the fruits of the scheme were transferred into two (2) accounts in Minang's name and one (1) account in the name of a woman with whom he had an "intermittent romantic relationship" certainly engenders suspicion.  But probability, not suspicion, is the touchstone.  *Khounsavanh*, 113 F.3d at 283; *Vigeant*, 176 F.3d at 569. Armed only with information about what followed the scheme's execution, the affidavit fails to make an explanation inculpating Minang any more or less probable than innocent ones.  This seems particularly true where the scheme, according to the affidavit, involves the "hacking" or "compromis[ing]" of email, a technical ability few people have and one which the affidavit does not suggest Minang possesses.  The facts contained in the affidavit make it no more probable that Minang has the

---

[8] Indeed, the affidavit in support of a criminal complaint charging the defendant with money laundering, which was incorporated by reference into the subject search warrant affidavit, indicates these schemes are sometimes carried out in different ways.  *See* Ex. A at ¶ 4(a) ("In some cases, the [perpetrators] hack into email accounts… and impersonate the user.  In other cases, the [perpetrators] 'spoof' the victim's email account by creating a substantially similar email address to impersonate the user.").

[9] Although not addressed to the specific allegations contained in the complaint, consider, for example, that the affiant in his application for criminal complaint, which contains virtually all of the facts relative to the fraudulent scheme, sought charges only for money laundering and not for wire fraud. Additionally, one would expect the affiant, whose investigation began with the fraudulent scheme, would seek authorization to search for evidence relating thereto (and not merely to money laundering) if he believed he had probable cause to do so.

technical wherewithal to execute the presumed internet-based scheme (or that he conspired with another who did) than an explanation which does not include his execution or participation in the scheme.  Therefore, as to Minang's involvement in the scheme itself, probable cause is entirely lacking in the affidavit.

The problem this creates bears directly on the issue of probable cause for the crime which the warrant authorized evidence to be searched for: money laundering in violation of 18 USC § 1956(a)(1)(B).  To violate the statute, a defendant must *know*, *inter alia*, "that the funds involved… in the financial transaction were the proceeds of some unlawful activity."  *U.S. v. Frigerio-Migiano*, 254 F.3d 30, 33 (1st Cir. 2001). But if the fact that the money went to an account allegedly controlled by the defendant cannot establish probable cause to believe he participated in the scheme, how can it establish his knowledge of the scheme?  It is respectfully submitted the facts set forth in the affidavit no more establish probable cause to believe Minang was aware of the underlying wire fraud than it does he actually perpetrated it, for the same reasons set forth above.

The government appears to have foreseen this evidentiary gap by attempting to fill it with references in the affidavit to warnings the affiant allegedly made to Minang about the source of the funds during the course of an interview on September 22, 2017.  Ex. A at ¶14.  The problem with this, however, is that the affiant, according to his affidavit, was aware only of two (2) of the alleged victims (those who had transferred funds to Bank of America accounts in July and August); the complaint with respect to the third victim was not received until September 24, 2017, two (2) days <u>after</u> the affiant's interview with Minang. During this interview, "MINANG was advised to not conduct any further transactions *with these funds*" but "if he received any additional funds in a similar manner," Minang was merely asked to "contact the interviewing Agents before doing

anything with the funds." Ex. A at ¶14.  Accordingly, taken at face value, Minang was put on notice of the source of the funds from the first two (2) transactions, but not the third.  As the affidavit makes clear, however, the cash withdrawals allegedly made by Minang shortly after the interviews were *not* made from an account about which he was put on notice.[10]  The affidavit thus failed to establish probable cause to believe Minang engaged in money laundering, in violation of 18 USC § 1956(a)(1)(B).

In sum, the affidavit failed to establish probable cause to believe he participated in the commission of the scheme.  It also failed to establish probable cause to believe Minang committed money laundering.  The only crime for which there could be probable cause is a wire fraud which the affidavit failed to link any particular perpetrator or location.  Evidence of that crime, based on the information supplied by the affidavit, could not be found in Minang's residence absent that link.

  b. Even if there was probable cause to believe Minang committed a violation of 18 USC § 1956(a)(1)(B), the affidavit failed to establish a nexus that evidence relating thereto would likely be found in his residence, and the affiant made a false statement of fact in reckless disregard for the truth which warrants a *Franks* hearing.

To satisfy the nexus element, the warrant must provide a "substantial basis" for concluding there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Khounsavanh*, 113 F.3d at 283 (1st Cir. 1997) (*citing Gates*, 462 U.S. at 238). The analysis involves a "common sense" reading of the warrant and consideration of all the circumstances,

---

[10] While the affidavit states Minang made four (4) withdrawals in increments just below the $10,000 currency transaction reporting requirement in July, *see* Ex. A at ¶11, this transfer occurred months before the affiant put him on notice about the nature of the source of those funds.  As set forth above, the affidavit fails to establish Minang's knowledge of the source of those funds prior to his interview with the affiant in September; those transactions, therefore, are incapable of constituting money laundering pursuant to 18 USC 1956(a)(1)(B).

including "the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide" evidence of a crime. *United States v. Charest*, 602 F.2d 1015, 1017 (1st Cir. 1979).

Even if there was probable cause to believe Minang engaged in money laundering, virtually no information ties that activity to the place to be searched, i.e. his home.  The affidavit details a total of nine (9) financial transactions with the funds derived from the alleged scheme: a wire transfer, four (4) cash withdrawals, and a cashier's check drawn from Minang's Bank of America account in early July, 2017; a wire transfer and cashier's check drawn from the Offre Trading account in late August, 2017; and two (2) cash withdrawals drawn from the Citizen's Bank account five (5) days the warrant was executed.

With respect to the transactions in July and August, common sense does not suggest receipts or similar documentation for cash withdrawals and cashier's checks would be present in the residence at the time of the search.  To find otherwise would first require an assumption, unsupported by the affidavit, that these materials made their way back to the subject premises to begin with.  It would then require concluding that someone would keep a receipt for cash withdrawals that allegedly went straight into one's own pocket, an act which seems to defy common sense, particularly if the person making the withdrawal is allegedly aware that the proceeds were derived from criminal activity, as required by 18 USC § 1956.  Indeed, the very purpose of the cash withdrawals, according to the affidavit, is to avoid currency transaction reporting; if this were true, common sense would suggest the paper trail created by a receipt or similar documentation would be quickly discarded.  *See U.S. v. Iacaboni*, 363 F.3d 1, 5 (1st Cir. 2004) ("Criminals dealing in large amounts of cash who wish to avoid the risks and practical difficulties of "putting it in the mattress" have thus developed strategies to avoid the creation of a

paper trail that can lead to apprehension."). Finally, as for the withdrawals in September, it does not seem common sensical for someone to bring to one's own residence cash withdrawn on the heels of an interview with FBI agents during which an order was given to contact the agents before withdrawing the funds. *See Charest*, 602 F.2d at 1017 ("Common sense tells us that it is unlikely that a murderer would hide in his own home a gun used to shoot someone.").

Aside from the foregoing transactions, the affidavit contains a single reference to Minang's residence: the Citizen's Bank account from which Minang allegedly withdrew funds on September 24, 2017 was "in the name of 'Minang Escrow' with an address of 800 West Street, Braintree, Massachusetts." *See* Ex. A at ¶ 15.  Materials provided in discovery, which appear to have been received from Citizen's Bank reveal this sworn statement to be false.  The Court in *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978) "established that a defendant is entitled to an evidentiary hearing to test the veracity of a warrant affidavit if he can make a substantial showing that the affiant, with reckless disregard for the truth, included a materially false statement in the affidavit." *U.S. v. Tanguay*, 787 F.3d 44, 52 (1st Cir. 2015).  Whether the affiant recklessly disregarded the truth "may be proven by inference from circumstances evincing obvious reasons to doubt the veracity of the allegations." *Id.* (internal quotations omitted).  The defendant must also establish the "allegedly false statement [was] necessary to the finding of probable cause." *U.S. v. Castillo*, 287 F.3d 21, 25 (1st Cir. 2002).[11]

First, the following materials provided in discovery, which are purported to be from Citizen's Bank, readily establish the statement that the account in question was registered to

---

[11] To be clear, the defendant submits the lack of nexus to his residence set forth in the affidavit and the *Franks* issue set forth herein are separate and independent bases for the relief the defendant requests herein.  However, given these issues share the same factual underpinnings and legal considerations, it appeared that discussing these issues as a unitary whole made more sense from an organizational viewpoint.

Minang's residence in Braintree was false: (1) a Business Certificate for the Town of Framingham for Minang Escrows has a corporate/residential address of 40 Queens Way, Apt. 9, Framingham, MA; (2) printed materials which appear to be from Citizen Bank's customer account software lists 40 Queens Way, Apt. 9, Framingham, MA as the linked address for the account; (3) the Business Certificate and customer account materials contain print dates of September 27, 2017, which is a mere two (2) days prior to the date the warrant was applied for.  *See* Ex C.  The affiant almost certainly had these or like materials in his possession.  The affidavit states the date the transfer was received by the Citizens Bank account and contains reproduced surveillance stills, both of which could only have been obtained from the bank itself.  By incorrectly matching the place to be searched with the residence associated on the account through which the most recent alleged unlawful banking activity occurred allows for a reasonable inference that the affiant doubted the veracity of the statement.  This is true especially where, as here, the incorrectly stated information, an address, is so easily discernable as being incorrect.

It is reasonable to expect that bank statements or other documents relating to a particular account would be located at its listed address.  Accordingly, by misidentifying the address associated with the Citizens Bank account, the Magistrate Judge considering the warrant could have been misled to believe such bank records (which the warrant specifically authorized a search for) would instead be located at the subject residence.  What is more, the Citizens Bank account was used, according to the affiant, to conduct the most recent financial transaction allegedly constituting money laundering.  Thus, by misidentifying the address, the affiant not only supplied a crucial, but false, link toward nexus, he simultaneously resolved the staleness issues surrounding the records related to the other accounts.  Given that this was the single reference to Minang's residence connecting, in a meaningful way, the particular place to be search with the specific crime

under investigation, the affiant's deliberate misrepresentation became essential to the probable cause analysis.

Although not as crucial, the affiant makes an additional misrepresentation as well as a material omission (all related to the same account) which could only have compounded the issue. Specifically, the affiant states that the transfer from the third victim was received by Citizens Bank on September 22, 2017, the same day as his alleged interview with Minang.  The affidavit then misrepresented the date the cash withdrawals were made by Minang as occurring on September 23, 2017, when in reality they occurred on September 25, 2017.  *See* Ex. C.  This also appears to be intentional in light of the affiant's penultimate paragraph to the complaint application.  *See* Ex. A at ¶ 19 ("Notably, MINANG withdrew these funds the day after agents informed him of the illegal nature of the scheme and advised him that the type of funds he had been receiving into his accounts were the proceeds of fraud.").  By incorrectly placing the withdrawals the day immediately following the interview (and one (1) day after the funds hit the account), the affiant was able to more powerfully suggest a guilty state of mind than what the truth (i.e. withdrawals made some three (3) days after the interview) would have allowed.

As for the omission, the affiant detailed various aspects of his interview with Minang, but did not include the fact that Minang advised the affiant he had moved mid-August from Framingham (the real address for the Citizens Bank account) to Braintree.  This omission has a cascading effect.  First, its inclusion would have decreased the likelihood records related to the Bank of America account would have been located at the residence in Braintree; common sense suggests a purge of unnecessary materials, such as old bank statements, would have been performed during the course of the move.  Second, the warrant impermissibly suggests Minang had a continuity of residence at the same location spanning the entire period he was engaged in

the alleged money laundering activity; that he moved half-way through between when the activity allegedly began in late June and when it terminated in mid-September does the precise opposite the continuity of residence would suggest in the context of this case.  Third, and relatedly, because the address for Minang's Bank of America account was not listed in the affidavit, the omission of his true residence at the time he allegedly opened the account, coupled with the misrepresentation regarding the Citizens Bank account, could have impermissibly led the Magistrate Judge to infer the same address was used to open both accounts.

In sum, the affidavit, as written, sets forth allegations which struggle to establish a nexus between Minang's residence and the alleged money laundering transactions.  When the false statements are inserted, and the omitted fact regarding Minang's change of residence is included, the affidavit fails entirely to establish an adequate nexus.  The foregoing sets forth a substantial basis to believe these falsities and omissions were made by the affiant in reckless disregard for the truth.  It is respectfully submitted Minang is entitled to a hearing to test the veracity of the warrant's allegations, pursuant to *Franks*.

**II. The Search Warrant Was Overbroad, Lacking Probable Cause To Believe Evidence Of Money Laundering Would Be Found On Minang's Computing Devices; That He Owned Electronics Did Not Mean Evidence Of Illegality Would Be Found There.**

"An affidavit demonstrates probable cause to search a locale where information in the affidavit reveals a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Barnes*, 492 F.3d 33, 36 (1st Cir. 2007). "[T]he application must give someone of reasonable caution reason to believe that evidence of a crime will be found at the place to be searched... Nexus can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment[,] and normal inferences as to where a criminal would hide [evidence of a crime.]" *United States v. Joubert*, 778 F.3d 247, 251–52 (1st Cir. 2015).  To prevent "exploratory rummaging in a person's belongings" the search must also be "confined in

scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause." *United States v. Burdulis*, 753 F.3d 255, 260 (1st Cir. 2014). General warrants are permitted only "when the surrounding circumstances render it reasonable." *United States v. Morris,* 977 F.2d 677, 681 (1st Cir. 1992).

"When the items to be seized are business or financial records... the First Circuit has adopted an 'all records' rule." *United States v. Ostrowski*, 822 F. Supp. 2d 66, 70 (D. Mass. 2011). "[W]here there is probable cause to find that there exists a pervasive scheme to defraud, all the business records of an enterprise may be seized, if they are ... accurately described so that the executing officers have no need to exercise their own judgment as to what should be seized." *United States v. Brien*, 617 F.2d 299, 309 (1st Cir.1980). However, "the 'all records' doctrine must be applied with caution" when the search is for records kept within the home; without "extraordinary proof… the broad categories of items that may be seized pursuant to an 'all records search of a home must be sufficiently linked to the alleged criminal activity so as to distinguish them from innocent, personal materials. *United States v. Falon*, 959 F.2d 1143, 1148 (1st Cir. 1992)

Here, the agents were seeking evidence of money-laundering but not fraud. *Contrast Ostrowski*, 822 F. Supp. 2d at 71 (defendant's years-long fraud in guardianship of his grandfather was "sufficiently pervasive" to justify general "all records" search warrant.). No investigation had been conducted with respect to the emails the anonymous senders allegedly received that caused them to transfer money to Minang's accounts. The money entered and left accounts controlled by Minang and his girlfriend via wire transfers, cashier's checks, and cash withdrawals in person, not via online banking. In short, nothing connected Minang's (entirely unsurprising) ownership of electronic devices with the FBI's evidence that he had been engaged in the sort of money-

laundering carried out long before the invention of the personal computer. *Contrast Joubert*, 778 F.3d at 251-252 (police had probable cause to search defendant's parents' home for child pornography after defendant's son told police he had helped move defendant's belongings to that address and defendant had sought help wiping hard drive he had stored there); *Burdulis*, 753 F.3d at 260 (emails from defendant showing his intention to send pornography in electronic form over the internet justified "a search matched in scope to that suspicion"); *United States v. Soto*, 799 F.3d 68, 85 (1st Cir. 2015) (identity theft documents produced with scanners and computers led to "practical, commonsense" conclusion that "evidence of their fraud and identity theft—such as additional computers, scanners, bank records, and identification documents" would be found there); *United States v. Scott*, 83 F. Supp. 2d 187, 197 (D. Mass. 2000) ("Similar to the First Circuit's determination in [*United States v. Feliz*, 182 F.3d 82 (1st Cir. 1999)] that it is reasonable to suppose a drug trafficker possessed documents showing the names and telephone numbers of customers and suppliers at his residence, this Court rules that it is equally reasonable to suppose that someone allegedly engaged in bank fraud and producing false securities on his computer would have records of the bank fraud and false securities on that computer.").

The First Circuit has long been concerned with overbroad records searches, well before the privacy concerns which have arisen in the digital age. *See In re Application of Lafayette Academy*, 610 F.2d 1, 3–4 (1st Cir.1979) (warrant established probable cause limited to fraud in the Federal Insured Student Loan Program; suppression of all other documents and records ordered); *United States v. Roche*, 614 F.2d 6, 7 (1st Cir. 1980) (ordering suppression where probable cause established only motor vehicle insurance fraud, but warrant authorized seizure of all reflecting a violation of 18 USC § 1341); Falon, 959 F.2d at 1148 ("borrower's files," "lists of borrowers," and "correspondence, memoranda and documents 'relating to loans, loan guarantees, potential

loans and potential loan guarantees'" reasonably related to the scope of the fraud established by the affidavit; all other categories of items suppressed where "the warrant failed explicitly to limit… to the subset directly linked to the alleged fraud"). *United States v. Diaz*, 841 F.2d 1, 4 (1st Cir. 1988) ("There is nothing in the affidavit to imply that any evidence of crime could be gleaned from 'all bank account records.' In fact, the affidavit seems to establish that the fraudulent transactions were all cash transactions, presumably to minimize the risk of discovery.").

More recently, the Supreme Court has recognized the privacy interests implicated by what amounts to a general warrant on all of Minang's electronic data are vast. *See Riley v. California*, 134 S. Ct. 2473, 2490 (2014). *See also United States v. Galpin*, 720 F.3d 436, 446-48 (2d Cir. 2013) ("Where, as here, the property to be searched is a computer hard drive, the particularity requirement assumes even greater importance."); *United States v. Payton*, 573 F.3d 859, 861–62 (9th Cir. 2009) ("There is no question that computers are capable of storing immense amounts of information and often contain a great deal of private information. Searches of computers therefore often involve a degree of intrusiveness much greater in quantity, if not different in kind, from searches of other containers.").

Following *Riley*, courts have been ready to strike down overbroad searches for electronic devices. In *United States v. Cordero-Rosario*, 786 F.3d 64, 69–72 (1st Cir. 2015), the court stated "[t]o determine whether there was a substantial basis for finding a nexus [to search the defendant's computer], it is important to identify at the outset the crime under investigation the affidavit established probable cause the defendant committed." There, the affidavit established the defendant had committed a lewd act against a minor; the warrant, however, authorized a search of the defendant's computer merely because the minor victim stated there was a computer in the defendant's residence which contained pornography. The court found this statement failed to

establish a sufficient nexus between the lewd act and the computer warranting its search.  *See also*

*United States v. Griffith*, 867 F.3d 1265, 1275–78 (D.C. Cir. 2017) (warrant authorizing search of

defendant's residence for all cell phones where affidavit established probable cause to believe he

committed a murder, but failed to aver any facts his phone was used around the time the crime was

committed).

Even if Minang's transactions with the third bank account, after being warned by the

affiant, established a basis to believe he engaged in money laundering sufficient for his arrest, it

provided no link to his bedroom or his computers.  The other evidence -- that his roommate had

cashed a check from one of the accounts, that he used bank branches that were reasonably local,

or that people who transferred money to accounts he controlled complained they did so in error --

did not justify providing the FBI with access to "a digital record of nearly every aspect" of his life

"from the mundane to the intimate."  *Riley*, 134 S. Ct. at 2490.

Nor is the warrant saved by the affiant's training and experience.  As he notes, some "86

percent of all U.S. Households owned at least one computer."  Ex. B at ¶ 12(b).  To premise a

search of any electronic storage device on the notion that computers are ubiquitous and capable of

storing evidence would be to write the particularity and nexus requirements out of the Fourth

Amendment.  As the D.C. Circuit stated in *Griffith*,

> [T]he government's argument in favor of probable cause essentially falls back on
> our accepting the following proposition: because nearly everyone now carries a cell
> phone, and because a phone frequently contains all sorts of information about the
> owner's daily activities, a person's suspected involvement in a crime ordinarily
> justifies searching her home for any cell phones, regardless of whether there is any
> indication that she in fact owns one. Finding the existence of probable cause in this
> case, therefore, would verge on authorizing a search of a person's home almost
> anytime there is probable cause to suspect her of a crime. We cannot accept that
> proposition.

867 F.3d at 1275.  The connection between Minang's alleged crimes and the agents' search is too tenuous, and the privacy interests involved too grave, for an all-records search to fall within the ambit of the Fourth Amendment's protections.

WHEREFORE, the defendant respectfully requests that his Motion To Suppress be granted.  In the alternative, the defendant requests a hearing on this issue and/or pursuant to *Franks v. Delaware, supra*.

Dated: May 30, 2018                     Respectfully submitted,
                                        YANNICK MINANG
                                        By and through his attorney,

                                         /s/ *R. Bradford Bailey*
                                        R. Bradford Bailey, BBO#549749
                                        BRAD BAILEY LAW, P.C.
                                        10 Winthrop Square, 4th Floor
                                        Boston, Massachusetts 02110
                                        Tel.: (857) 991-1945
                                        Fax: (857) 265-3184
                                        brad@bradbaileylaw.com

**Certificate of Service**

I, R. Bradford Bailey, hereby certify that on this the 30th day of May, 2018, I caused a true copy of the foregoing *Defendant's Memorandum of Law in Support of his Motion to Suppress Evidence* to be served upon all necessary parties to this matter by virtue of electronically filing the same via the CM/ECF system.

                                         /s/ *R. Bradford Bailey*
                                        R. Bradford Bailey