UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 17-10376-FDS |
| | ) | |
| YANNICK A. MINANG, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Over several months in 2017, Yannick Minang brazenly carried out a Business Email Compromise ("BEC") and money laundering scheme that successfully stole hundreds of thousands of dollars.  He stole this money not from corporations or wealthy individuals, but from regular, hard-working people on the verge of making significant life purchases.  The scheme worked as follows:  The victims were about to purchase real estate and shortly before closing on their properties, they received emails from their real estate agents or title companies.  These emails attached wiring instructions that directed them to send funds to accounts that Minang and others had opened and controlled. The emails, however, were spoofed – made to appear to be coming from title company representatives and real estate agents, when in fact they were sent from email accounts created solely to carry out the fraud.  This was, in many ways, a classic BEC scheme that targeted individuals to unwittingly wire money to bank accounts controlled by members of Minang's criminal group.  It succeeded by tricking the victims.  Sadly, this classic scheme worked all too well and the victims wired their money straight to Minang and his co-conspirators, who transferred the funds to others abroad or simply spent the money themselves.

Numerous victim statements submitted to the government describe not just the monetary harm the defendant caused, but also the personal and emotional harm he inflicted on his victims. These statements speak volumes about the impact of Minang's criminal conduct:

- "The only $150,000 I have ever had was taken from me . . . Stealing my 150k took more than money from me. It stole every hour I put in working for that money too. The hours I stayed late, the sacrifices I made, it was all for nothing because of you, Yannick . . .   You took so much more than my money. You took my trust that systems created to help and protect my money is reliable. You took my independence by causing me to move back in with my parents. You took my ability to buy a home. You took my time today and for always as I have to meticulously check every credit card bill, email, receipt, you name it…because of you. Who knows where my personal information you stole lives. How many people have it? When will this nightmare come back and haunt me again as it has numerous times since the first blow?" (VIN 5827561).

- "These funds were intended for our four daughters' higher education, possibly, in the USA or abroad here in Canada . . . Now, the funds are gone, and we wonder what the future of our kids' education will be. Our reality has to be adapted to Y Minang's unscrupulous way of making a living. Following this fraud, we changed our way of living. The funds that were stolen from us were like a 'safety net' for our family. This was money available for eventual difficult times, or for a special family dream vacation someday. This money could be used if illness were to hit on our family. Raising four children is a big responsibility and the financial stress that comes with it is no small thing. Another major impact on our way of living is the constant 'mistrust and unsafe feeling' in our everyday dealings. Everything today is done electronically. For us, last time we trusted electronics, we lost our life savings …" (VIN 593141).

- "My heart immediately sank. I went from experiencing the highest of joys of brining my daughter home to feeling utter despair, disbelief and anxiety that I had never felt before.  I immediately left home to drive to the bank. My hands wouldn't stop shaking as I was driving, and all I could do was repeat a prayer that this could somehow be rectified.  After spending two hours at the bank and returning home with no answer, I broke the news to my wife.  We sat in our bedroom in silence for an hour [ . . . ] I was worried that we'd lose out on the home because we had just lost all that money.  Fortunately, my father stepped in to help us out.  He agreed to withdraw $200,000 from his retirement annuity account to help with the down payment.  By withdrawing early from his retirement account, he incurred taxes of approximately $80,000. Feels of gratitude were offset by feelings of immense guilt as I felt so sorry for him." (VIN 5521319).

In these excerpts, the defendant's victims describe how hard they worked to save the money Minang so cavalierly stole. They detail the devastating effects these losses had on them and their families, and they painfully describe how they were forced to alter their lives as a result.

After getting arrested and charged with the instant offenses, Minang was completely unfazed.  He continued ignoring authority and acted as if the rules that apply to others do not

apply to him.  For example, while on pre-trial release, he was ordered not to use drugs – Minang

kept using marijuana.  (PSR ¶ 4.)  He was ordered to take regular drug tests – Minang repeatedly

tried to tamper with and defeat the tests administered by Probation.  *Id.*  Most significantly, in

response to the order that he not engage in criminal conduct, Minang committed an even larger

BEC scam causing even greater losses to more victims.  *United States v. Minang*, 19-cr-10264-

PBS, Indictment (Doc. # 14).  This time around however, Minang corrected the mistakes that led

to his prior arrest.  He is unrepentant and has demonstrated a complete lack of respect for the

Court and the law.

Accordingly, the government requests that the Court impose a sentence of 51 months

incarceration, three years of supervised release, a forfeiture money judgment in the amount of

$465,616.75, and restitution.

## I.      FACTS

The Pre-Sentence Report accurately summarizes Minang's offense conduct and the

government will not recount it here. (PSR ¶¶ 8-44.)

## II.     DISCUSSION

In determining a defendant's sentence, several steps are necessary.  First, the court must

consider the Sentencing Guidelines and determine the advisory sentencing guideline range.  The

advisory sentencing guideline range, once calculated, establishes the court's "starting point" or

"initial benchmark."  *See Gall v. United States*, 552 U.S. 38, 50 (2007).  Next, the court should

consider the various factors set forth in 18 U.S.C. § 3553(a).  Only after consideration of those

factors should the court reach its ultimate determination.  *See United States v. Martin*, 520 F.3d

87, 91 (1st Cir. 2008).  In weighing the § 3553(a) factors, the First Circuit has emphasized that

an individualized determination is, at all times, the touchstone: while a deviation from the

guidelines may be warranted in certain instances; in other instances, it will not be. If the court determines that a sentence below the GSR is warranted, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of variance." *Gall*, 552 U.S. at 50. The greater the departure, the greater the justification required. *Id.*

### A. Sentencing Guideline Calculations

In the most recent PSR revised April 10, 2019, Probation calculated Minang's Total Offense Level as 21, (PSR ¶ 64), and determined that he falls within Criminal History Category I, (PSR ¶ 69). This calculation included a one level reduction for acceptance under USSG § 3E1.1(b).[1] (PSR ¶ 63). The government however, has informed Probation that it no longer intends to move for the reduction under subsection (b), but that it otherwise agrees with its guidelines calculation. Without the third level acceptance of responsibility reduction under subsection (b), the resulting Total Offense Level for Minang as calculated by Probation would be 22, which renders an applicable Guideline Sentencing Range ("GSR") of 41-51 months incarceration.

Minang has objected to the application of the sophisticated laundering enhancement under USSG § 2S1.1(b)(3) arguing that the facts of his case do not warrant its application. (PSR, Def. Obj. #3, pg. 31.) The government and Probation disagree.

---

[1] On January 28, 2019, Minang pled guilty the charges in the indictment pursuant to a plea agreement in which the government agreed to move for the acceptance of responsibility reduction USSG § 3E1.1(b). (Doc. # 81.) However, Minang subsequently breached this plea agreement by failing to comply with its terms, violating one or more conditions of his pretrial release and engaging in additional criminal conduct. As a result, on July 1, 2019, the government exercised its option to be released from its commitments under the agreement. (Doc. # 100.)

The Application Note to the guideline defines sophisticated laundering as "complex or intricate offense conduct pertaining to the execution or concealment of the U.S.C § 1956 offense." U.S.S.G. § 2S1.1, App. Note 5.  Several examples are provided of conduct that has been found to trigger this enhancement.  For example, "[s]ophisticated laundering typically involves the use of (i) fictitious entities; (ii) shell corporations; (iii) two or more levels (*i.e.*, layering) of transactions, transportation, transfers, or transmissions, involving criminal derived funds that were intended to appear legitimate; or (iv) offshore financial accounts." *Id.*  The "factors listed in Application Note 5 are illustrative but not required; they are typical but non-exhaustive." *United States v. Fish*, 731 F.3d 277, 280 (3d Cir. 2013).

All of these things are present here. Minang opened numerous business bank accounts in the names of fictitious entities such as Minang Trades and Commercial Metals Minang (Bank of America), Minang Investments (Santander Bank), and Minang Escrows (Citizen's Bank). *See, e.g.*, Bank of America and Santander Signature Cards, attached hereto as Exhibit A.  He even went as far as legally creating shell companies (Minang Escrows, Minang Investments, etc.).  *See* Business Organization Certificates, attached hereto as Exhibit B.  He also routinely moved criminal proceeds through multiple different accounts in order to make it appear as if they were legitimate business transactions, and he wired those proceeds to foreign bank accounts.

The illustration below is an example of the layering, structuring, and international bank transfers that Minang employed as part of his laundering scheme.



Minang's transfers to South Africa qualify as use of "offshore financial accounts" under the application notes to this guideline. USSG § 2S1.1(b)(3), App. Note 5(A)(iv). "This fact alone provides sufficient basis for the District Court's sophistication determination." *United States v. Amaris-Caviedes*, 701 F. App'x 84, 85 (3d Cir. 2017); *see also United States v. Miles*, 360 F.3d 472, 482 (5th Cir. 2004) (explaining that where one of the Note 5 factors are met, "the commentary clearly subjects an individual to the sophisticated laundering enhancement").

Creating and using fictitious business entities to transact in the victim fraud proceeds and structuring cash withdrawals served the defendant several ways. First, it lessened the likelihood that any one of the financial institutions would become suspicious of the high dollar transfers into the accounts and alert authorities. Second, it ensured that the financial institutions not file currency transaction reports on his high dollar cash withdrawals. Finally, it provided an air of legitimacy to his operation and allowed him to continue operating his scheme.

Based on the above, the Court should overrule defendant's objection to the application of the sophisticated laundering enhancement.

**B.  Sentencing Factors Under 18 U.S.C. § 3553(a)**

On balance, the sentencing factors set forth in 18 U.S.C. § 3553(a) call of a substantial

prison sentence.  Although other factors may apply, the most significant with regard to Minang

are the seriousness of the offense, the need to promote respect for the law and provide just

punishment for the offense, and the need to afford adequate deterrence.

In fashioning the appropriate sentence for the defendant, the Court must consider the

nature and circumstances of the offense – including the impact the crime had on its victims.  By

all accounts, Minang's crimes were severe and warrant the government's recommended

sentence.  BEC cases are a widespread problem for organizations and businesses. According to

the FBI, its Internet Crime Complaint Center (IC3) received 20,373 BEC-related complaints in

2018 with adjusted losses of over $1.2 billion.  *See* 2018 IC3 Internet Crime Report at 12,

available at https://pdf.ic3.gov/2018_IC3Report.pdf (last visited Sep. 19, 2019).  Between

October 2013 and May 2018, the FBI reported that there were over 78,000 domestic and

international incidents reported to law enforcement authorities and financial institutions with a

combined loss exposure of over $12.5 billion.  *See* Business E-mail Compromise The 12 Billion

Dollar Scam, available at www.ic3.gov/media/2018/180712.aspx (last visited Sep. 19, 2019).

As noted above, Minang's crimes had a victim impact far greater than the amount of the

money lost. Minang's crimes took a mental and emotional toll on them that they have to live

with forever.

When deciding on the appropriate sentence, the Court must also weigh the need for a just

punishment and the need to protect the public from future harm.  Here, both of these sentencing

considerations compel the imposition of the government's recommended sentence.  Through his

actions, the defendant permanently affected the lives of his victims and their families.  A

significant punishment is fair and just when imposed in response to significant harm, and the government's sentencing recommendation is the appropriate response here.

The sentence the Court imposes must promote respect for the law.  In this case, the Court should impose the government's recommended sentence to demonstrate both to the defendant and the community that laws are meant to be followed.  Here, the defendant knew that what he was doing was wrong and illegal, but persisted anyway.  This sort of cavalier attitude not only demonstrates disrespect for the law and the criminal justice system, if left unpunished, promotes and encourages others to follow suit.  A strong sentence by the Court is necessary to avoid this.

A different, but equally important consideration and sentencing factor, is the history and characteristics of the defendant, which in this case, cut in favor of a lengthy prison sentence. Minang has had far more opportunity than other defendants that come before the Court. He is educated and comes from a stable and supportive family.  At the time of the offense, he was employed as a software engineer and made a very good living.  It goes without saying that he "knew better" and certainly had no need to commit any crime.  Moreover it appears he remains committed to breaking the law.  The fact that he engaged in even more egregious criminal conduct after being charged and convicted of the instant offense is significant and the Court should consider that when imposing its sentence.

Finally, in determining the ultimate sentence, the Court is required to consider what, if any, deterrent effects would be the result of such a sentence.  In this case, both general and specific deterrence weigh in favor of the government's recommendation.

There are many others who commit similar fraud and money laundering crimes.  Given the prevalence of such schemes, not all perpetrators can be thoroughly investigated, charged, and brought to justice.  When a defendant like Minang is held accountable for his criminal activity,

the sentence the Court imposes is a message to on-line fraud perpetrators, the victims of such schemes, and the citizenry.  By sentencing the defendant as recommended by the government, the Court would send a strong message to perpetrators like Minang and would-be fraudsters that if they engage in similar schemes, they will face justice and the penalties will be severe. Conversely, a lesser sentence with little or no jail time would send the unintended message that such crimes are not serious and reinforce the perception that the risks of engaging in such criminal activity (getting caught and serving prison time) are outweighed by its benefits (defrauding victims and making money).

With respect to specific deterrence, a strong sentence is necessary to ensure that _Minang_ is deterred from criminal activity when he leaves prison. Since his initial arrest, Minang has blatantly refused to comply with court orders, engaged in efforts to defeat drug testing administered by Probation, and committed additional, more egregious crimes.  Nothing about his experience with the criminal justice system has thus far has deterred him from continuing to engage in criminal conduct. The Court's sentence should.

### III.     CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence Minang to 51 months incarceration, followed by three years supervised release, a forfeiture money judgment in the amount of $465,616.75, and restitution.  Although such a sentence falls at the higher end of the defendant's GSR, it is sufficient and not greater than necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence.  Anything less would be insufficient to reflect the scale of the loss and severity of the harm the victims have endured.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

Date: September 19, 2019                   By:     /s/ *Jordi de Llano*
                                                          Jordi de Llano
                                                          Assistant United States Attorney
                                                          United States Attorney's Office
                                                          One Courthouse Way
                                                          Boston, MA 02210
                                                          617-748-3100
                                                          Jordi.de.Llano.Campos@usdoj.gov

**CERTIFICATE OF SERVICE**

I, Jordi de Llano, hereby certify that the foregoing was filed through the Electronic Court Filing system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Date: September 19, 2019                   /s/ *Jordi de Llano*
                                                        Assistant United States Attorney